TOWNSHIPS OF MAHONING COUNTY ET AL., APPELLANTS, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

(No. 78-517—Decided April 25, 1979.)

42

*Messrs. Muldoon, Pemberton & Ferris, Mr. Boyd B. Ferris, Mr. Joseph R. Bryan, Messrs. Henderson, Covington, Stein, Conchess & Messenger* and *Mr. James L. Messenger,* for appellants.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. Mark C. Sholander,* for appellee.

*Ms. Frances McGovern,* for intervening appellee Ohio Edison Co.

HOLMES, J. The relevant sections of law involved herein are R. C. 4905.33 and 4905.35, which, in pertinent part, provide:

R. C. 4905.33.

"No public utility shall * * * charge, demand, collect, or receive from any person, firm, or corporation a greater or lesser compensation for any services rendered * * * than it charges, demands, collects, or receives from any other person, firm, or corporation for doing a like and contemporaneous service under substantially the same circumstances and conditions. * * *"

R. C. 4905.35.

"No public utility shall make or give any undue or unreasonable preference or advantage to any person, firm, corporation, or locality, or subject any person, firm, corporation, or locality to any undue or unreasonable prejudice or disadvantage."

Appellants' principal contention is that Ohio Edison's method of classifying its subscribers is unjustly discriminatory in violation of R. C. 4905.33 and 4905.35. Appellants, in their application before the commission, sought equalization or uniformity of rates between the unincorporated areas and municipalities, but argued to the commission, as well as before this court, that if equalization is impractical, the commission in the alternatve should establish a more reasonable classification for the rates than the present political boundary classification.

Appellants claim that there are no substantial demographic disparities which would justify a substantially higher rate for electric service to township residents than is charged for like service to municipal residents.

Appellee argues that Ohio Edsion's classification system is a valid and reasonable one in that the population density of municipalities is greater than that of unincorporated areas and that, as a result, the cost of providing service to the unincorporated areas is higher.

R. C. 4905.31 permits a public utility to classify its customers for rate-making purposes, so long as the classification system utilized has a reasonable basis. See *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403. Likewise, R. C. 4905.33, relied upon by the appellants, does not prohibit rate discrimination *per se*;

rather, it prohibits charging different rates when the utility is performing "* * * a like and contemporaneous service under substantially the same circumstances and conditions. * * *" R. C. 4905.35 is to the same effect, and prohibits "* * * unreasonable prejudice or disadvantage * * *."

Absolute uniformity in rates or prices is not required by statute or case law. A reasonable differential or inequality of rates may occur where such differential is based upon some actual and measurable differences in the furnishing of services to the consumer.

Although different criteria or classifications may be utilized in the establishment of reasonable utility rate structures, the basic underlying consideration is that of cost of service rendered. The differential in rates based upon the cost of serving municipalities in contrast with the cost of serving outlying unincorporated areas was recognized and approved in *Buckeye Lake Chamber of Commerce* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 306.

The use of political boundaries as one of the considerations of a rate classification system is not unlawful *per se*. To the contrary, under Sections 3, 4 and 5 of Article XVIII of the Ohio Constitution, incorporated municipalities are vested with the power to fix rates for electric service to customers within their corporate limits. See *Columbus Gas & Fuel Co.* v. *Pub. Util. Comm.* (1933), 127 Ohio St. 109.

In accord with the constitutional provisions, R. C. 4909.34 provides that municipalities may adopt utility rate-fixing ordinances if they so desire. If such ordinances are passed, they either become contracts if accepted by the utility, or, if not acceptable to the utility, the latter may appeal to the Public Utilities Commission for a determination of the rates. It appears to have been the practice over the years for some utilities, such as Ohio Edison, to negotiate with the large and intermediate size municipalities for agreeable rate ordinances.

Villages and unincorporated areas, conversely, do not have rate-making authority under Ohio law. Therefore,

such rates are established by way of the utility's application to the Public Utilities Commission.

Accordingly, Ohio Edison in the past has established a classification system of municipalities of varying size categories with negotiated rate ordinances, and a category consisting of townships and small municipalities with less than 1,000 population that did not choose to pass rate ordinances.

For those areas where the utility companies establish rates and classifications of customers, such rates and classifications must be established in accordance with R. C. 4909.-151, which provides as follows:

"In fixing the just, reasonable, and compensatory rates, joint rates, tolls, classifications, charges, or rentals to be observed and charged for service by any public utility, the public utilities commission may consider the costs attributable to such service. The utility shall file with the commission an allowance of the cost, except cost related to sparsity of population, for services for which a change in rates is proposed when evidence relating thereto is presented which indicates that the rate or rates do not generally reflect the cost of providing these services. As used in this section, 'costs' includes [sic] operation and maintenance expense, depreciation expense, tax expense, and return on investment as actually incurred by the utility. The costs allocated to each service shall include only those costs used by the public utilities commission to determine total allowable revenues."

This statute does not prohibit the utility, in the rate-making process, from filing with the commission an analysis of its costs related to the sparsity or density of population. A more reasonable interpretation of the pertinent language of this section is that in a rate determination proceeding the utilities are not required to file an allocation of cost related to sparsity or density of population.

However, this does not mean that the utility may not utilize population figures and density data to support a differential in costs of service rendered as between munici-

palities and more sparsely settled areas such as townships. By the same token, upon a hearing of a complaint on behalf of the villages and townships brought pursuant to R. C. 4905.26, such data as population trends and population density or sparsity should be considered by the commission as being probative on the question of the differential in costs of service rendered and the establishment of reasonable rate classifications.

Although we have determined that rate structures and classifications may well be established upon the basis of political boundaries, the requirement still remains that any such rate, or classification, as established by the utility, must be upon a reasonable and rational basis. Accordingly, the rate differential as established by the utility between the municipalities and the unincorporated areas must have a reasonable basis. If it does not, then the rate difference constitutes an unlawful discrimination.

James D. Wilson, the Chief Rate and Valuation Engineer for Ohio Edison, stated in his deposition that the classifications as used by the company had been established in the early 1950's and used ever since. He stated further that population density or sparsity has been a factor in Ohio Edison's rate classification system for residential customers.

Wilson, when testifying before the commission, again related that population density was a factor in the rate classification, stating:

"* * * having this past history of population, using population as a guide, because we know it does relate to density of customers, we have used population * * *."

"* * * [O]n a specific first go, we do look at population, yes."

"Well, through the years, as I say, we have taken a look at the density of customers within these broad classifications and within the urban areas. We have used population as a guide to the rate level that they should be. * * *"

Here, there is no evidence that the rate classifications were established upon any reasonable nexus to the cost of

providing services to the consumers within any given classification or category. The record does show that rates for these customer classifications were established in a series of rate proceedings, but apparently at no time did the commission examine the reasonableness of the classifications themselves.

Wilson testified as to methodology of the company in establishing rates, as follows:

"* * * [O]nce having made that determination [customer classification], then obviously we use a cost study to determine what that applicable rate should be."

"* * * [Y]ou make this classification of communities, then we do a cost study, which justifies the level of rates within those communities."

In commenting upon the company's approach in rate-setting by classification, the hearing officer herein commented as follows:

"* * * your practice has been to start with the classification, and then do the cost of service study, rather than to start with cost of service studies and arrive at some classification. * * * [T]he idea that because the Commission has approved allocation in its practice, and also the practice of filing cases in the fashion in which you filed them in the past, does not seem to me to support the contention that that necessarily means that across the classifications, customers are necessarily paying a true cost, something related to the cost of serving those customers."

On behalf of the appellants' position that the classifications used by Ohio Edison were unreasonable, and bore no rational nexus to the differential in rates, evidence was adduced tending to show that the unincorporated areas of the three counties of Trumbull, Mahoning and Columbiana, as they were 20 years ago, differed rather significantly from what they are today. The population of the unincorporated areas was shown to have risen sharply, while the population of the cities was markedly diminished.

Several of complainants' witnesses testified that the unincorporated areas within which they reside are indistinguishable from neighboring incorporated municipalities

where residential customers are charged lower rates. It was pointed out that the population of Austintown Township, Mahoning County, is more than 43,000, which is larger than 11 of the 13 municipalities located within the three-county area which have lower rates.

Even though the classifications may have been valid when inauguarated in 1952, the political or governmental units have varied so greatly in composition and population that at this time such classifications have little touch with reality, and are not meaningful. An example of this was the evidence offered on behalf of the complainants that the incorporation of the village of Lordstown in 1976 re sulted in a change in rates from the higher unincorporated village rate to the lower "B" level city rate through a negotiated ordinance, presumably without a cost-of-service study. This procedure obviously tends to erode the claim of reasonableness of such rate classifications.

As to cost of service differentials, the evidence disclosed that, first, no cost-of-service studies are made for townships and the only cost-of-service studies made for individual communities are for those municipalities that are involved in ordinance rate appeals, and that, second, Ohio Edison does not have the empirical data needed to calculate the costs of service on which customer classifiation could be based. There is no listing by political subdivision of the number of meters, poles, miles of transmission and distribution lines, number of service vehicles, substations, or number of customers, etc.

It would appear from the evidence adduced before the commission that the classification of the consumers, and thence the rates—or what more appropriately would be the establishment of the rates based upon cost factors and thence the establishment of classifications—has not been carried out here upon a reasonable cost-of-service basis.

Upon a review of the totality of the evidence submitted by the appellant complainants, it is our determination that there was a sufficiency of data and statistical material to establish a *prima facie* case that the classifications based primarily, if not entirely, upon their unincorporated status

presented an unreasonable basis for these classifications as a rate-determining base.

Although the commission, upon complaint by consumers, and after investigation and hearing, is given the discretion by R. C. 4909.26 whether to order a substitution of rates or classifications if such are found to be unreasonable or unjustly discriminatory, we conclude that the evidence presented here would dictate affirmative action on the part of the commission in resolving what appears to be an unreasonable classification.

Therefore, we hereby reverse the order of the Public Utilities Commission in this matter, and remand the cause to the commission for the appropriate proceedings to determine the more reasonable classification of the various townships and unincorporated areas, in order to more nearly effectuate the reasonable costs of serving the comparable areas with similar population and density patterns.

*Order reversed and cause remanded.*

CELEBREZZE, C. J., HERBERT, W. BROWN, CONNORS, SWEENEY and PRYATEL, JJ., concur.

CONNORS, J., of the Sixth Appellate District, sitting for P. BROWN, J.

PRYATEL, J., of the Eighth Appellate District, sitting for LOCHER, J.